UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

**GAIL DUDLEY,**

      **Plaintiff,**

  v.                                 Case No.: 2:13-cv-914
                                                 JUDGE SMITH
                                                 Magistrate Judge Deavers

**STONECROFT MINISTRIES, INC.,** *et al.*,

      **Defendants.**

## OPINION AND ORDER

This matter is before the Court upon Defendants' Motion for Summary Judgment (Doc. 20). Plaintiff responded to Defendants' motion (Doc. 23) and Defendants replied in support of their motion (Doc. 26). This matter is now ripe for review. For the following reasons, Defendants' motion is **GRANTED**.

### I. BACKGROUND

This lawsuit arises out of the former employment relationship between Defendant Stonecroft Ministries, Inc., ("Stonecroft") and Plaintiff, Gail Dudley ("Plaintiff"). Plaintiff is an African-American, Ohio resident who served in various roles for Stonecroft including time spent as a Regional Field Director and the Vice President of Diversity. (*See* Doc. 1, Compl. at ¶¶ 7, 11–12). Stonecroft is an Oregon non-profit corporation with its principal place of business in Kansas City, Missouri. (*Id.* at 2). Stonecroft operates its Christian outreach programs throughout the states, including Ohio. (Doc. 19-3, Croy Dep. at 165). Stonecroft has employees in at least 11 states throughout the United States. (*Id.*).

Defendant Lorraine Potter Kalal ("Kalal") is the President and CEO of Stonecroft (Stonecroft and Kalal will be collectively referred to as "Defendants"). (*See* Doc. 1, Compl. at ¶ 4). Kalal served as President and CEO at the time of Plaintiff's resignation from Stonecroft. (Doc. 19-1, Dudley Dep. at 73). Plaintiff began her employment with Stonecroft in 2006 and resigned on January 31, 2013. (Doc. 1, Compl. at ¶ 8). During Plaintiff's tenure, Stonecroft had approximately 45 employees in 11 or 12 states. (Doc. 19-3, Croy Dep. at 165–66). Plaintiff was Stonecroft's first, and last, employee in Ohio during all relevant times. (*Id.*). Because Stonecroft only had offices in Missouri, Plaintiff worked from home during the entirety of her career with Stonecroft other than when she attended meetings or events around the country. (Doc. 19-1, Dudley Dep. at 25). To supplement its employees, Stonecroft has many volunteers throughout the United States, organized into local leadership and regional leaders. (Doc. 28-2, Thompson Dep. at 117). Stonecroft has around 20,000 volunteers, and, at one point during Plaintiff's tenure, the volunteers were 98% Caucasian with an average age of 72. (Doc. 27-1, Davis Dep. at 54). The volunteers have no handbook and the corporation exerts very little control over them. (Doc. 19-3, Croy Dep. at 174, 220). Oftentimes, volunteers independently chose where certain local events would be held regardless of a Stonecroft employee's preference. (Doc. 28-2, Thompson Dep. at 120).

In 2011, Plaintiff received a promotion, a raise, and began serving on the executive board of Stonecroft as the Vice President of Diversity. (Doc. 19-1, Dudley Dep. at 48; Doc. 28-4, Thompson Dep. at 158). Even with the raise, she received lower pay than the other vice presidents on the executive board. (Doc. 28-4, Thompson Dep. at 158). In 2012, every other executive committee member had at least one person reporting to them while Plaintiff did not have anybody who reported to her. (*Id.* at 159–60). Doris Thompson, the VP of Field Ministry

2

and Plaintiff's direct supervisor in 2012, attributed Plaintiff's lower pay to Plaintiff's lack of supervisory duties. (*Id.*).

Plaintiff alleges that she was subjected to daily instances of harassment based on her race during her time at Stonecroft. Plaintiff also felt that her diversity initiatives, development, and fundraising were being ignored or routed to other projects. (Doc. 19-1, Dudley Dep. at 42–43). Plaintiff also had issues with other Stonecroft employees and with Stonecroft volunteers. In 2010, Anne Schneider, a Stonecroft employee, repeatedly told Plaintiff that Plaintiff would not be fired because of her race. (Doc. 19-2, Croy Dep. at Ex. 16). Plaintiff reported the incident to Sue Croy, the Vice President of Human Resources. Ms. Croy and the Vice President of Field Ministry, Doris Thompson, met with Ms. Schneider to discuss the effect her comments had on Plaintiff. (*Id.*). Ms. Schneider apologized to Plaintiff soon after. (*Id.*). Plaintiff accepted the apology and "let it go from [her] end . . . ." (*Id.*). Even after Plaintiff "let it go," Ms. Croy told Plaintiff that Stonecroft planned further action or discussion as necessary until Ms. Schneider learned from the process. (*Id.*).

In 2012, Plaintiff also had problems with a Stonecroft employee, Jeffrey Zogg, the Vice President of Communication. During a phone call regarding Plaintiff's publication of an article that Mr. Zogg did not see before it was published, Plaintiff and Mr. Zogg got into a heated argument. (Doc. 19-1, Dudley Dep. at 135–36). Plaintiff reported to Ms. Croy that Mr. Zogg was yelling at her and talking over her answers before she could speak. (*Id.*). During the conversation, Plaintiff told Mr. Zogg, "You make me feel as though I am a little black girl age 7 or 8 placed in a corner that must submit to you like I'm your slave." (*Id.*). Mr. Zogg responded by repeatedly yelling at Plaintiff that he was not a racist. (*Id.*). Shortly thereafter, Mr. Zogg sent an article to the executive team titled, "Black Women in America." (*Id.* at 137). Plaintiff

3

reported to Ms. Croy that the phone conversation and Mr. Zogg's dissemination of the article made her feel verbally harassed and violated. (*Id.*). She felt the article was insensitive and offensive by implication. (*Id.*). The incident was investigated by a third party who found that Mr. Zogg should be disciplined and that Mr. Zogg and Plaintiff needed coaching on how to converse with one another. (Doc. 19-2, Croy Dep. at Ex. 13). The investigator noted that Plaintiff, "took the conversation with Jeff on Jan. 19 to a place it did not need to go, and that the expectation is she choose less offensive words in her interactions with co-workers in the future." (*Id.*). Jeff received six months of coaching from his direct supervisor, Ms. Thompson, but avoided any major disciplinary action. (Doc. 28-3, Thompson Dep. at 143).

Plaintiff also had problems with Stonecroft volunteers at a Stonecroft event at a country club in Aurora, Ohio. (Doc. 23-1, Dudley Aff. at ¶ 3). Plaintiff was asked to use a side door by a volunteer when all other attendees used the main door. (Doc. 19-1, Dudley Dep. at 28). Plaintiff told Stonecroft about the event and asked for a venue change but Stonecroft did not respond to her request. (Doc. 19-3, Croy Dep. at 177).

The relationship between Stonecroft and Plaintiff soured in September of 2012 when Kalal was hired as CEO and restructured the executive team. (Doc. 19-1, Dudley Dep. at 73). Kalal met with Plaintiff and changed Plaintiff's job title to Ministry Consultant from Vice President of Diversity. (Doc. 23-1, Dudley Aff. at ¶¶ 8–9). Ms. Thompson and Cheryl Davis, both executive committee members, had their job titles changed, but each retained their vice president title. (Doc. 27-1, Davis Dep. at 47; Doc. 28-1, Thompson Dep. at 47). Plaintiff expressed disappointment at her title change to co-workers and to Kalal. (Doc. 28-4, Thompson Dep. at 181).

4

Plaintiff asserts that she was provided no clear indication of what her future job responsibilities would entail and was "ostracized" following her change in title. (Doc. 23-1, Dudley Aff. at ¶¶ 9–10). Kalal told the entire executive committee that it may be up to five months, until March 2013, before the new organizational structure would be understood and communicated. (Doc. 28-4, Thompson Dep. at 194). Ms. Davis, Ms. Thompson, and Ms. Croy's positions all changed significantly during the restructure. (*Id.* at 185). Plaintiff further alleges her voice was silenced in executive team meetings and she was scolded, "for conduct which was considered acceptable when performed by [her] white peers." (Doc. 23-1, Dudley Aff. at ¶ 11). Plaintiff's pay was not reduced as a result of the job title change and there were no discussions about modifying or changing Plaintiff's job responsibilities. (Doc. 19-1, Dudley Dep. at 71–73). Plaintiff's position on the executive committee was never terminated even though Kalal changed her title. (Doc. 28-4, Thompson Dep. at 186). Last, Plaintiff alleges that Kalal made several comments concerning Plaintiff's hours and that Kalal stated that she could not see Plaintiff working more than 20 hours a week in the next fiscal year. (Doc. 19-1, Dudley Dep. at 91–92). Plaintiff resigned on January 31, 2013, due to the allegedly hostile work environment and the potential reduction of her hours. (*Id.*).

After resigning, Plaintiff filed a charge with the Ohio Civil Rights Commission ("OCRC"). On June 20, 2013, the parties agreed to mediate the dispute and signed an agreement recognizing the mediation was confidential. (Doc. 1-2, Agreement to Mediate at 1). Plaintiff alleges that following the unsuccessful mediation, she was called by a Stonecroft employee, Toni Sandberg, who questioned why Plaintiff was suing Stonecroft and knew of the specific numbers discussed during the mediation. (Doc. 19-1, Dudley Dep. at 96–97). On December 12, 2013, the OCRC issued a Letter of Determination dismissing Plaintiff's charge for lack of jurisdiction

5

because Stonecroft did not have enough employees in Ohio.  (Doc. 26, Def.'s Reply, Ex. D, Croy Aff. at Ex. 1, "Letter of Determination").  Plaintiff requested reconsideration from the OCRC, but the OCRC upheld its initial finding that it had no jurisdiction over the matter.  (*Id.* at Ex 2, "Letter of Determination upon Reconsideration").  There was no adjudicatory hearing for Plaintiff's charge.  (Doc. 23-1, Dudley Aff. at ¶ 12).

Plaintiff initiated this case on September 16, 2013.  Plaintiff brings five claims against Defendants: 1) racial discrimination under 42 U.S.C. § 1981; 2) racial discrimination under O.R.C. § 4112.02; 3) breach of contract under Ohio law; 4) hostile work environment under 42 U.S.C. § 1981; and 5) hostile work environment under O.R.C. § 4112.02.

## II. STANDARD OF REVIEW

Defendants moved for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure.  Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  The Court's purpose in considering a summary judgment motion is not "to weigh the evidence and determine the truth of the matter" but to "determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).  A genuine issue for trial exists if the Court finds a jury could return a verdict, based on "sufficient evidence," in favor of the nonmoving party; evidence that is "merely colorable" or "not significantly probative," however, is not enough to defeat summary judgment.  *Id*. at 249-50.

The party seeking summary judgment shoulders the initial burden of presenting the court with law and argument in support of its motion as well as identifying the relevant portions of "'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact."

*Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56). If this initial burden is satisfied, the burden then shifts to the nonmoving party to set forth specific facts showing that there is a genuine issue for trial. *See* Fed. R. Civ. P. 56(e); *see also Cox v. Kentucky Dep't of Transp.*, 53 F.3d 146, 150 (6th Cir. 1995) (after burden shifts, nonmovant must "produce evidence that results in a conflict of material fact to be resolved by a jury"). In considering the factual allegations and evidence presented in a motion for summary judgment, the Court must "afford all reasonable inferences, and construe the evidence in the light most favorable to the nonmoving party." *Id*.

### III.  DISCUSSION

Defendants make numerous arguments in support of their motion: 1) that Plaintiff failed to exhaust her administrative remedies before filing a claim under Title VII; 2) that Stonecroft is not an employer under Ohio Revised Code § 4112.02(A); 3) that Plaintiff cannot make out prima facie cases for her claims of harassment or discrimination under either state or federal law; and 4) that Plaintiff has no cognizable contract claim. Plaintiff does not argue that she filed an EEOC charge but otherwise attempts to factually rebut all of Defendant's claims.

**A.    Title VII Claims**

In order for this Court to reach the merits of Plaintiff's Title VII claims, Plaintiff must first have exhausted all of her administrative remedies. *Haithcock v. Frank*, 958 F.2d 671, 675 (6th Cir. 1992) (overruled on other grounds by *Nat'l R.R. Passenger Corp. (Amtrak) v. Morgan,* 536 U.S. 101, 111–14 (2002)). "It is well settled that a plaintiff must satisfy two prerequisites before filing a Title VII action in federal court: (1) timely file a charge of employment discrimination with the EEOC; and (2) receive and act upon the EEOC's statutory notice of the right to sue ('right-to-sue letter')." *Granderson v. Univ. of Mich.*, 211 F. App'x 398, 400 (6th Cir. 2006). "The burden of demonstrating exhaustion lies with the plaintiff." *Smith v.*

7

*Healthsouth Rehab. Ctr.*, 234 F. Supp. 2d 812, 814 (W.D. Tenn. 2002); (citing *McBride v. Citgo Petroleum Corp.*, 281 F.3d 1099, 1106 (10th Cir. 2002).

Plaintiff's failure to allege or offer any proof that she filed a charge with the EEOC, or received a right to sue letter from the EEOC is dispositive as to all of Plaintiff's federal claims under well settled Sixth Circuit case law. Accordingly, Defendants are entitled to summary judgment on Plaintiff's claims for racial discrimination and hostile work environment 42 U.S.C. § 1981 because Plaintiff failed to exhaust her administrative remedies.

**B.     State Law Discrimination Claims**

Regarding Plaintiff's state law claims, Defendants argue that Stonecroft is not an employer under Ohio Revised Code § 4112.01, and thus, that Stonecroft is not subject to the Ohio discrimination statute, Ohio Revised Code § 4112.02. Defendants assert that the OCRC decision has already decided the issue and that even if the OCRC decision has no preclusive effect, Stonecroft's only employee in Ohio was Plaintiff. Plaintiff makes three counter-arguments: 1) issue preclusion does not apply; 2) Stonecroft employed numerous employees who worked in the state of Ohio; and 3) certain volunteers are persons employed by Stonecroft within Ohio.

**1.     Preclusive effect of the OCRC's Findings**

Defendants ask this Court to find that the OCRC's decision finding no jurisdiction is *res judicata* regarding the question of whether Stonecroft is an employer under Ohio Revised Code § 4112.02. The OCRC found that it did not have jurisdiction to hear Plaintiff's claim in this case because Stonecroft is not an employer under Ohio Revised Code §§ 4112.01 or 4112.02. Both of Plaintiff's state law discrimination claims arise under Ohio Revised Code § 4112.02 which holds that is unlawful, "[f]or any **employer**, because of the race, [and/or] color, . . . of any person, to discharge without just cause . . . or otherwise to discriminate against that person with respect to

8

hire, tenure, terms, conditions, or privileges of employment, or any matter directly or indirectly related to employment." (emphasis added). An employer under Ohio Revised Code § 4112.01(A)(2) is a "person employing **four or more persons** within the state, and any person acting directly or indirectly in the interest of an employer." (emphasis added). A person:

> includes one or more individuals, partnerships, associations, organizations, corporations, legal representatives, trustees, trustees in bankruptcy, receivers, and other organized groups of persons. 'Person' also includes, but is not limited to, any owner, lessor, assignor, builder, manager, broker, salesperson, appraiser, agent, employee, lending institution, and the state and all political subdivisions, authorities, agencies, boards, and commissions of the state.

O.R.C. § 4112.01(A)(1).

*Res judicata* actually encompasses two distinct concepts. Under the principle of claim preclusion, or "true" *res judicata*, "a final judgment on the merits of an action precludes the parties or their privies from relitigating issues that were or could have been raised in that action." *Federated Dep't Stores, Inc. v. Moitie*, 452 U.S. 394, 398 (1981). Issue preclusion, or collateral estoppel, mandates that "[w]hen an issue of fact or law is actually litigated and determined by a valid and final judgment, and the determination is essential to the judgment, the determination is conclusive in a subsequent action between the parties, whether on the same or a different claim." *Heyliger v. State Univ. & Cmty. College Sys.*, 126 F.3d 849, 852 (6th Cir. 1997). The purpose of the doctrine of *res judicata* is to conserve judicial resources and to protect parties from the cost of litigating and relitigating the same matters in various forums. *See Allen v. McCurry*, 449 U.S. 90 (1980).

When considering the preclusive effect of OCRC findings, this Court has held that a review by a state court is "'critical' in establishing preclusion." *Dickinson v. Zanesville Metro. Hous. Auth.*, 975 F. Supp. 2d 863, 875 (S.D. Ohio 2013) (Marbley, J.). Although the OCRC's decision is informative to this Court based on their extensive experience on the issue, Defendants

9

admit that Plaintiff did not seek state court review of the OCRC decision and thus the decision has no preclusive effect on this Court through true *res judicata* or issue preclusion.

### 2. Other Stonecroft Employees

Regarding the definition of "employer," Plaintiff does not dispute that she was Stonecroft's only employee stationed in Ohio. Instead, she alleges that other Stonecroft officials were present at events within the state of Ohio. (*See* Doc. 23-1, Pl.'s Aff. at ¶5). Plaintiff provides no dates or locations of any of those events. (*Id.*). "Reading the definition of 'employer' in [Ohio Revised Code §] 4112.01(A)(2), along with the prohibition contained in [Ohio Revised Code §] 4112.02(A), it is apparent that the legislature meant that the employer must have at least four employees **at the time the discrimination occurred**." *Cisneros v. Birck*, No. 94 APE08-1255, 1995 WL 222156, at *5 (Ohio Ct. App. Apr. 11, 1995) (emphasis added). Thus, even if the Court accepts the Plaintiff's bare allegation that Stonecroft employed others within Ohio, Plaintiff still must provide some evidence Stonecroft employed others within Ohio at the time of her harassment or discrimination. Plaintiff's affidavit does not provide such evidence. Accordingly, Plaintiff's assertion that certain employees worked within Ohio at some point in time during her tenure with Stonecroft is insufficient to create a material question of fact as to whether Stonecroft was an employer under Ohio law.

### 3. Stonecroft Volunteers

Plaintiff's final argument is that Stonecroft "employs" volunteers in Ohio. She affirmed, "Stonecroft employs hundreds of volunteer leaders within the state of Ohio for the purpose of advancing Stonecrof[t]'s mission, some of whom hold titles, including but not limited to 'Stonecroft Regional Coordinator,' 'Stonecroft Area Coordinator,' 'Stonecroft Speaker Trainer,' 'Stonecroft Development Leader' and receive payment from Stonecroft." (Doc. 23-1, Dudley

10

Aff. ¶ 6). She provides no basis or other evidence regarding the payment the volunteers allegedly receive. (*Id.*). Plaintiff also points to Ohio tax law, which states, "every individual who performs services subject to either the control and/or will of an employer, whether as to what shall be done and/or how it shall be done, is an employee for purposes of Ohio income taxation." (*Id.*). Defendants answer that during Plaintiff's employment with Stonecroft, Stonecroft paid no other person wages, salary, or compensation in Ohio, did not withhold taxes for any other person, and did not pay unemployment taxes in Ohio. (Doc. 26, Def.'s Reply, Ex. D, Croy Aff. at ¶¶ 4–6).

The Stonecroft volunteers likely meet the exceedingly broad definition of a "person" under Ohio Revised Code § 4112.01. However, the inquiry does not end there because an employer must "employ" a "person" under Ohio Revised Code § 4112.01 to be subject to Ohio Revised Code § 4112.02. "Employ" is not defined in § 4112.01. *Eyerman v. Mary Kay Cosmetics, Inc.*, 967 F.2d 213, 217 (6th Cir. 1992). Because the term is not defined, the Court looks to other statutes in the same area of law and to related state and federal case law concerning labor and employment law.

One Ohio labor and employment statute defines "employ" as "to suffer or permit to work." O.R.C. § 4111.03(D)(1). Another statute, Ohio Revised Code § 4111.14(B), the Ohio General Assembly noted that "employ" under 4111.14(B) would have the same meaning as in the Fair Labor Standards Act of 1938. Regarding volunteers, the statute specifically notes, "'Employ' and 'employee' do not include any person acting as a volunteer." O.R.C. § 4111.14(B)(2). In turn, the corresponding provision of the FLSA specifically defines "employ" to mean, "to suffer or permit to work[.]" 29 U.S.C. § 203(g). "[W]ork"—as used in § 203(g)—means "physical or mental exertion" that is "**controlled or required** by the

11

employer[.]" *Mendel v. City of Gibraltar*, 727 F.3d 565, 573 (6th Cir. 2013) (emphasis added). As Plaintiff acknowledges, "employee" status is "largely dependent on who had the right to the control the manner or means of doing the work. (Doc. 23, Pl.'s Mem. Opp. at 13). It stands to reason that any definition of "employ" must ultimately deal with the specific issue of control as evidenced by both federal and state employment statutes.

Recently, the Sixth Circuit considered volunteers as potential employees in two Title VII cases and came to differing conclusions based on the facts of each case. The first case considered whether a volunteer firefighter could bring a hostile work environment claim under Title VII. *Bryson v. Middlefield Volunteer Fire Dep't, Inc.*, 656 F.3d 348, 350 (6th Cir. 2011). At issue was whether the volunteer firefighters during the time of the hostile work environment were employees under Title VII even though they were volunteers. As an initial matter, the Court determined that strict remuneration is not an independent antecedent to a finding that a person is an employee, but that when determining if a person is an employee, a Court must use the *Darden* factor test which requires that "'all of the incidents of the relationship must be assessed and weighed with no one factor being decisive.'" *Id.* at 353–54, quoting *Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318, 323 (1992). The volunteers in question "provide[d] firefighting services to the Department in exchange for benefits from the Department, including worker's compensation coverage, insurance coverage, gift cards, personal use of the Department's facilities and assets, training, and access to an emergency fund." *Id.* at 354. Some even received an hourly wage. *Id.* at 355. The court found these facts were important factors the district court had to consider and thus, reversed and remanded the district court's granting of summary judgment. *Id.* at 355–56.

The second case considered whether volunteers for the Red Cross were employees under Title VII. *Marie v. Am. Red Cross*, 771 F.3d 344, 352 (6th Cir. 2014). To differentiate between volunteers and employees, the Court used the *Darden* factor test. *Marie*, 771 F.3d at 354. The *Darden* factors consist of 13 factors regarding the entire employment relationship. However, three specific factors test the level of control an employer has over a potential employee: "The right to control of the means and manner of performance, the right to assign additional projects, and the discretion over when and how long to work are *Darden* factors that, under these circumstances, are related to one another and bear very strongly on the issue of control." *Id.* at 356. Regarding control, the court found no evidence the Red Cross ever required the volunteers "to operate on a fixed schedule or closely controlled their work when they volunteered." *Id.* at 357. As the court noted, even when the Red Cross did set schedules, assign tasks, and assign additional tasks, the "plaintiff[s] failed to produce any evidence that the schedule and assignments of [the] employer were any more than requests that [they] had the right to refuse and negotiate." *Id.* The court also found no evidence that volunteers were terminated for failure to conform to the control exercised by the Red Cross. *Id.* Regarding pay and remuneration, the Court noted, as in this case, there was no evidence of any tax consequence for the volunteers, no evidence of payment to the volunteers, and no evidence of employee benefits paid to the volunteers. *Id.* at 356. Ultimately, the Court noted, "The economic reality is that when volunteers work without traditional forms of remuneration like salary and benefits, employers are generally without leverage to control that volunteer's performance. And control is '[t]he crux of *Darden's* common law agency test." *Id.* at 357 (quoting *Weary v. Cochran*, 377 F.3d 522, 525 (6th Cir. 2004)). "Since economic dependence is one of the primary sources of

13

employer control over employees, this fact significantly undercuts the Sisters' argument that they were under the control of either agency." *Id.* at 358.

In this case, the question is whether the volunteers are employed by Stonecroft. As noted above, the word "employ" concerns mainly the *Darden* control factors. Accordingly, there is no evidence provided by Plaintiff demonstrating the necessary amount of control to create a genuine issue of material fact as to whether Stonecroft employed the volunteers. Plaintiff's unsupported and unqualified affidavit is inadequate because the only evidence provided is that the Stonecroft volunteers had titles and the bare allegation that the volunteers received some form of payment. (Doc. 23-1, Dudley Aff. at ¶ 6). The remainder consists of a conclusory statement that these volunteers were "employed" by Stonecroft. It is true that Ms. Croy testified that a volunteer could be asked to step down or required to step down if the volunteer did something "pretty severe," but admitted that she did not know who would make such a decision. (Doc. 19-3, Croy Dep. at 218). She also testified that Stonecroft has "very little control over many of the things that [volunteers] do." (*Id.* at 174). Stonecroft volunteers could even choose where and when events occurred without the input of the Stonecroft executive board. (Doc. 28-2, Thompson Dep. at 120). Ms. Croy also testified there is no handbook for volunteers other than manuals for specific positions. (Doc. 19-3, Croy Dep. at 220).

In sum, this case is more similar to *Marie* than *Bryson* because there is no evidence that the Stonecroft volunteers received the extensive remuneration and benefits provided to the firefighters in *Bryson*. Moreover, Stonecroft had very little control over the volunteers, provided no written regulations or guidelines regarding their work, and the process by which volunteers were terminated was so indeterminate that a former Vice President of Human Resources did not even know who would make such a decision. Under such circumstances this Court finds that

14

Stonecroft does not "employ" its volunteers as that term is understood under Ohio Revised Code §§ 4111.01 and 4112.02.

Last, Plaintiff points to the Ohio tax law for a definition of which individuals are employed within Ohio. Even if the Court were to agree that Ohio tax law is helpful for determining who Stonecroft employed, Plaintiff has no evidence rebutting Stonecroft's assertion that Stonecroft did not pay any withholding tax for any person in Ohio during the time Plaintiff was employed. In this case, Plaintiff's reliance on tax law actually weighs against a finding that Stonecroft employed the volunteers.

Because Plaintiff provided no proof that other Stonecroft employees were employed in Ohio during the time of her discrimination, that Stonecroft sufficiently controlled the work of the volunteers so as to employ them, or that Stonecroft paid Ohio withholding taxes for those volunteers or any other employee, Stonecroft is not an employer under Ohio Revised Code §§ 4112.01 or 4112.02. Accordingly, Stonecroft is entitled to summary judgment as to Plaintiff's state law discrimination and hostile work environment claims.

**C.      Breach of Contract**

Plaintiff's final claim alleges Defendants breached the confidentiality provision in the Mediation Agreement by discussing the specifics of the mediation, including figures, in a staff meeting open to non-board members. Defendants challenge Plaintiff's breach of contract claim on the basis that Plaintiff cannot satisfy all of the elements required under Ohio law. Under Ohio law, there are four elements to a breach of contract claim: 1) a contract; 2) performance by the non-breaching party; 3) non-performance by the breaching party without legal excuse; and 4) the non-breaching party suffers damages as a result of the breach. *Maxey v. State Farm Fire & Cas. Co.*, 689 F. Supp. 2d 946, 950 (S.D. Ohio 2010) (citing *Garofalo v. Chicago Title Ins. Co.*, 661 N.E.2d 218, 226 (Ohio Ct. App. 1995)). Neither Plaintiff's Complaint nor Plaintiff's summary

15

judgment briefing allege any damages as a result of the breach of the Mediation Agreement. Without any evidence of damages or even an allegation of damages, Plaintiff's breach of contract claim must fall.  Defendants are entitled to summary judgment as to Count 3 of the Complaint.

## IV.     CONCLUSION

Based on the foregoing, Defendants' Motion for Summary Judgment is **GRANTED**. The Clerk shall **REMOVE** Document 20 from the Court's pending motions list.  The Clerk shall enter final judgment in favor of Defendants and **REMOVE** this case from the Court's pending cases list.

**IT IS SO ORDERED.**

  */s/ George C. Smith*             
**GEORGE C. SMITH, JUDGE**
**UNITED STATES DISTRICT COURT**